May it please the court. There are two issues I would like to address, both concerning Ms. Scott's statements at the police station the night she was arrested. The first set of statements were made to the police, the second to the Department of Child and Family Services social worker about two hours after her police interrogation was over. The statements to the police were made after the police gave her Miranda warnings. Before she made any statements about the death of her daughter, she said to the police repeatedly, I'm so scared, I don't know what to do, I don't know what to say. The officers replied, we want you to tell us your side of the story. Ms. Scott replied, but I don't know what I should do, I should talk to an attorney. The interview should have stopped right there. Why do you say that? Because... Is that an unequivocal request for counsel from Miranda? Yes. That's not what Davis tells us. And Davis, he said, quote, maybe I should talk to a lawyer. Correct. How is that different from I should talk to an attorney? Because the word maybe is absent. And should, which is a subjunctive, is not as conditional as maybe I should talk to an attorney? It is not. And I would invite the court's attention... Does that clearly establish the Supreme Court textual analysis? The Supreme Court in Davis said that maybe is what made that defendant's statement ambiguous. Not I should. Not I should. All right. If he said I should talk to a lawyer, that would not be sufficient? I'm sorry? I mean, if he said I think I should, I would like to talk to a lawyer, would that be sufficient? This court held in Clark against Murphy that that had an element of ambiguity to it. Of course. But the court focused specifically on the words I think. And that is sufficiently textually different from I should talk to an attorney. It is. There is no conditional aspect to I should talk to an attorney. In our brief, we give an example. Suppose somebody is in an emergency room in a hospital, says, I have a chest pain. I don't know what it is. I should talk to a doctor. There's nothing conditional about that. It's a request to speak to a doctor. No, it's a reflection of the man's idea of how serious his condition is. Well, if he's in context, if he's at an emergency room and he's speaking to somebody at the intake desk, and he says I should speak to a doctor, that's plainly a request to speak to a doctor. It's not simply a reflection of his state of mind. In the same way, Miss Scott, in police custody, being interrogated, having been given her Miranda rights, which include a warning that she has the right to speak to counsel, says I should talk to an attorney because I don't know whether to make a statement to you or not. There's nothing ambiguous about that. Even the minority, I guess the concurring minority in Davis, said that there wasn't a problem after the somewhat more ambiguous statement there, because it included the maybe, there wasn't a problem with the police officer trying to clarify whether there was a request for counsel or not. And so I look at what happens here, and the discussion that follows immediately isn't continued interrogation as such. It's discussion about whether she wants to consult with a lawyer. She asks, when will I be able to see somebody? He said, well, in a couple of days you go to court. The decision is yours. We have to stop the interview. We can't take your statement if that's what you want to do. So we don't know what you want to do. You tell us what you want to do. I ask Your Honor to pause at that point, because when she says, when will I be able to talk to an attorney, and he says, in a couple of days, he is saying to her, you cannot consult an attorney tonight. He is, in my submission, trying to encourage her to make a statement without the presence of counsel. But he's also telling her that if she makes a decision that she wants to talk to an attorney, even if the actual talking will be postponed, they will have to stop talking to her. But they don't stop talking. But she hasn't made the decision. She has made the decision, and Edwards says, there's a bright line. Once she makes that decision and she speaks in words  Mind you, she does not have to speak with the discrimination of an Oxford Don. That's in Davis. If an ordinary person would understand her to mean, I want to speak to counsel, the interview must stop. Well, that goes back and puts an awful lot of weight on at what point do the officers have enough basis to go try to clarify what she wants to do. I understand you're trying to cut it off right there. So if we focus purely on the statement, I should, I say, and certainly my kids say, I should a lot without following that with a statement of what they're actually going to do. I should, I mean, we're all, we're dancing on the head of a pin. I have trouble understanding exactly where the line gets drawn, but Davis tells us that maybe I should's not on the far side of the line. And this court in Clark says that the words I think I should, I think is what adds the element of ambiguity, indicating that without those words and without maybe, as in Davis, I should talk to an attorney is not an ambiguous invocation of counsel. If the police aren't sure, and I submit that they were sure here, then they should ask her, are you saying you want to speak to counsel? Well, they said that some words to that effect, Sergeant Rodriguez. Well, well, I don't know. That's a decision you got to make. As if he understood her not to have made an unequivocal decision. All she had to say is, well, that's what I want to do. And she doesn't say that. She says, when will I be able to talk to an attorney? She goes to the next question, not saying, I want to talk, I want an attorney. Well, her statement, when will I be able to, is simply a confirmation that she wants to talk to an attorney. That's one way to look at it, because the other way to look at it is, if it's going to take a long time, then I don't want to talk to an attorney. She has the right to have counsel present immediately. And the right not to have counsel present immediately. If she wants to talk to them. She can say, I don't want to talk to an attorney. If it's going to take two days, I don't want to talk to an attorney. Well, I submit that's not what she's saying. And what the police have done there by saying you can't see an attorney for two days is to discourage her from invoking that right and encourage her to talk to them without the presence of counsel, without even the ability to speak to counsel. But once she says I want to see an attorney, even if it takes two days, then under Edwards they'll stop examining her and they still say so. They say, I want you to make that decision. Have you made that decision? And she answers that she hasn't made the decision. The detective's words show in my submission that they understood she was invoking her right to counsel because they say, we have to stop the interview. We cannot take a statement. And yet they go on and they say, you say you don't know what to do. You say you want to tell the truth. You don't know what you want to do. And then the other detective, Rivera, says, you said the only way someone's going to believe you, these words are all dissuasive. Can I ask you a question? How long before this conversation took place was she given her Miranda warning? Immediately before. Immediately before. She was given the Miranda warnings and this is what she says in response. What Miranda warnings were given? That you have the right to remain silent. You have the right to have counsel and to have counsel present with you during the questioning. Anything you say, it may be, will be used against you in evidence. She was given the standard Miranda rights. You're sure? Yes. They're in the transcript. Yes. It was tape recorded. There was no dispute about that. We're not contesting that the police misspoke. No. Before you lose all your time, although we're going to move on to the second issue. I want you to go to the second issue because I want you to focus specifically. I've had real trouble trying to parse through the instructions and trying to figure out exactly what the potential effect of the misinstruction is. That's the third issue. Third issue. Well, go to the third issue. All right. If you want the second issue, I'll ask you a question about that then. But if we conclude that you don't win on the first issue. Yes. Is there a second issue left? There is. The second issue is the admission of the statements she made to the social worker. Are those materially different from the statements she made? They are not materially different, but they nevertheless have a substantial and injurious effect on the jury's verdict. And the record shows that. And so under Brecht, there is still prejudice. I'll say briefly, on this issue, the Supreme Court's decision in Mathis is controlling. And Mathis decides that if a government agent questions a prisoner and takes potentially incriminating statements from the prisoner, then the government agent is required to give Miranda warnings before questioning that prisoner. The Cervantes exception on which the state relies doesn't apply here at all. That's a very narrow exception that applies only in situations of on-the-scene questioning of prison inmates about prison or jail crimes. But she'd already gotten her Miranda warnings. You mean she has to get another Miranda warning? Yes. Every time the policeman goes to see her, he's got to give her a Miranda warning? She's not a policeman. This is a social worker. Any time a social worker or a court clerk or anybody goes to see her, she's got to give a Miranda warning? If there is the potential that she's going to make self-incriminating statements, yes. And Mathis clearly decides that. Hasn't the Supreme Court now given us a time period? Maryland against Schatzer. But this is well within the time. This is only two hours. Well, isn't that the point? I mean, doesn't that tell us, in effect, that the first warnings aren't stale yet? This is not about the staleness doctrine. This is about whether somebody in this suspect's situation would assume that the Miranda warnings given by the police in a criminal investigation would apply equally to a social worker questioning her in a dependency child custody case. And I submit that no reasonable person in Ms. Scott's position would make that assumption. You know something? Earl Warren would agree with you 100 percent. But he's not on the court anymore. He isn't. But I stand in good stead if he would have supported me on that. Let me address the question of prejudice here. This was a close case by any measure. There were only four days of evidence, and the jury took three and a half days to reach a verdict. The prosecution admitted before trial that without Ms. Scott's statements, they really had no case. Even if the police, the statements she made to the police were properly admitted, the additional statements that she made to the social worker were still prejudicial. And the evidence of that in the record is the fact that the jury asked for Julianne Boyd, the social worker's testimony, to be re-read to her. To them, rather. And still took three and a half days to reach a verdict. You know, that really doesn't mean much. I've had juries deliberate two days on a traffic ticket, you know. It is a measure, according to this court's jurisprudence, of a close case. We have a lot of jurisprudence. Moreover, she and her defendant, Foster, were tried together, albeit by separate juries. His jury did not hear. They acquitted him of all but the least serious charge. Were they tried in the same court? Yes, they were. Two separate juries. Yes. And his jury were excluded when her statements were admitted in evidence. Okay. Yes. You cite Mathis, but my notes indicate that Mathis stands to the proposition that Miranda warnings are required only if, quote, a reasonable person would believe there has been a restriction of his freedom over and above that in his normal prisoner setting, unquote. What circumstances would make Ms. Scott to believe that her freedom was restricted over that when she was already in prison? I will tell Your Honor, and I invite Your Honor's attention to Clark v. Murphy, a decision of this court, in which they said the fact that she was being questioned, or Clark, he was being questioned, about a matter different from the one for which he was in prison was the additional restraint on his freedom. That's Clark v. Murphy. It's cited and quoted in our opening brief. How could a social worker asking her about the welfare of her children give Scott the idea that her freedom was going to be restricted? A social worker restricts your freedom? No. She's being put in a dilemma here. No, no. Restriction of freedom. Just that. Is there any restriction of freedom that a social worker can visit on me? Yes, because the freedom is whether I can get up and leave. And here she is being told there's going to be a... But she's already a prisoner. She can't get up and leave. She's in... No, she can leave the room where the social worker is in and say, I don't want to speak to you anymore. So any interview by any person... By a government agent. By a government agent, you can't leave. Is that your idea? It restricts your freedom if a government agent starts talking to you? Well, it would depend on what the government agent is questioning you about. If it's a subject which may result in you making self-incriminating statements that can lead to criminal prosecution, then yes. But there's a restriction of his freedom over and above that in his normal prisoner setting. Now, how can her freedom be restricted more than she's already in prison? Do you have a case that says that a social worker interviewing a prisoner restricts a prisoner's freedom while the interview is going on? I don't think you do. This is from... I said Clark. I meant Cervantes. I'm so sorry. This is on page 41 of our opening brief. The questioning of Mathis by a government agent, not himself a member of the prison staff, on a matter not under investigation within the prison itself, in other words, not a prison crime investigation, quote, may be said to have constituted an additional imposition on his limited freedom of movement, thus requiring Miranda warnings. That's from... You're reading from Mathis? No, I'm reading from Cervantes. Cervantes. Yes. Which is at 589 Fed Second at page 428. Who wrote that opinion? I don't know. These judges probably have three or four nights a week for a month writing it. Wallace, circuit judge. Wallace, circuit judge. Okay. Pardon? No further questions, please. Okay. Judge Clipton, you asked about the third issue, which was the instructional error. Clearly, it's not disputed that there was an error. Was it prejudicial? Yes, it was. Because what it told the jury was you can be... Let me rephrase it. The jury can convict Ms. Scott of murder if they find that her co-defendant, Foster, committed felony child endangerment and murder is a natural and probable consequence of that felony. Not that murder was committed by Foster, but the question is, is murder a natural and probable consequence? A reasonable jury could say, yes, certainly it is a natural and probable consequence. And in that way, in a vein somewhat akin to the felony murder rule, it makes her, in the jury's eyes, automatically guilty of murder if her co-defendant committed felony child endangerment and they believe that murder is a natural and probable consequence. Remember, he was acquitted of murder. So this may very well have been the basis on which they convicted her. I'm not a California lawyer, although heaven knows over the last several years I've learned a lot more about California law. So I approach this and I say he's convicted of felony child endangerment. How big a leap is it to murder? I understand what happened in his case with a different jury, but ordinarily, because of the felony murder rule, it's not a big leap to murder. So what piece is missing? Well, I'm familiar with the felony murder rule wouldn't make it very difficult to get a murder conviction. No, they didn't. So what's missing? This is not an enumerated felony under the felony murder rule. No, it's not. Felony murder rule doesn't apply here. And that's why I said it's somewhat analogous, because the jury is using something in place of a finding of malice of forethought. There's a vicarious liability aspect to this. Because she was an aider and abetter. I'm sorry? Because she was an aider or abetter. She was an aider and abetter to felony. Child endangerment. Right. Which had the natural and approximate effect of killing a child. Well, that's a question that the jury has to find under this instruction. Well, wasn't the jury also instructed that they couldn't find her guilty of murder unless the child endangerment, unless the death was a natural and, forget the word, approximate, natural. Natural and probable. Natural and probable result of the child endangerment. The jury was told that, wasn't it? But they have to find under the law that Foster committed murder. And they never made that finding, nor did his jury. The instruction as given is incorrect. There's no question about that. It's not disputed. It's incorrect because the third element is that they must find that the co-defendant, Foster, committed murder. But they weren't told that. They were told they must find that he committed child endangerment. And the probable consequence of the crime was the probable consequence of the crime of felony child endangerment that the child be killed. Yes, that's theoretically. And that's certainly true. So what exactly is missing? What's missing is a finding that Foster committed murder. And break that down into pieces. What element? Is it malice that's missing? Yes. In his case, it's malice that's missing. Anything else? Well, that's enough. No, I understand that. But I'm trying to catalog this because as I approached this before, it was sort of with the premise of the felony murder rule, which I now understand doesn't apply here. That's right. So now I've got to go back to, okay, what are the elements of murder that aren't necessarily recovered? Well, they would have to prove, assuming second-degree murder here, which is what she was convicted of, that he committed an act inherently, this is the California law, inherently dangerous to human life, under circumstances in which he knew there was that danger and consciously disregarded it. And they never made any such finding. Nor did his jury. How does that differ from the findings that are necessary for felony child endangerment? In terms of his mens rea, which is, I guess, what we're focusing on now. Because he has to be conscious, he has to consciously disregard the risk that the child will be killed. So he has to be aware of the risk and consciously disregard it. And consciously disregard it. That's implied malice under the California law. And for the conviction for felony child endangerment, there's no element of conscious disregard. Okay. Were the same instructions given to both juries? I don't know. I mean, obviously this instruction would not have been given to Foster's jury. You don't know if they were instructed at the same time? I think, I believe, I don't want to swear to this, but I believe that the juries were instructed separately. Was he charged as an aider and abetter or simply as a principal? That I don't know. All right. Thank you. I'd like to reserve, I know I'm oversigned, but a minute or two. Thank you. It please the court, Deputy Attorney General David Wilden for the warden. The California Court of Appeal reasonably applaud Davis in finding that the Miranda warnings were valid here in the police interview, in the initial police interview. I should talk to an attorney is almost identical to the phrase in Davis. Maybe I should talk to a lawyer. In fact, Davis gives us two examples, which is really helpful. Yeah, but why do we have to go through all this parsing out of language and all these semantics? She indicated she wanted to talk to a lawyer. You know, I think what's tragic about all of this is that Miranda came out, do you know when? I believe in 1967. That's when I first got on the bench. And a lot of officers were having problems giving the Miranda warnings. And I was doing about 14, 15 preliminary hearings a week in San Fernando. So I bought for 10 cents a piece, 100 cards. And they had the warning and they had the, they had the waiver. And after the detective would testify and kind of botch up the warning, I would give him one of those. I passed out a hundred of them, almost. And many of them regarded giving the Miranda warnings as a law enforcement tool. It helped them get people to confess because they were pleasant. They would make the statement. The person would feel that this officer is a decent person. I've done wrong and I want to talk to him. And that's what would happen. But now you go fast forward, whatever it is, 45 years. The whole Miranda thing is a big joke. The police thinks it's funny. It's a hindrance. The TV people make fun of it. And so what it's done is kind of engender in the police a disrespect for the law. They cut every quarter they can. And the courts have done the same thing. The courts have turned it into a weapon to assist the prosecution. You can ask people questions. I give them their Miranda warnings and get some information. And you're in effect. And if it's inculpatory, they're not going to testify. Right? Am I right about that? Well, I appreciate your concerns. Yeah. Well, OK. They're not going to testify. So if you don't testify in a criminal case, it's rare unless you've got some big, highly publicized case, that you're going to get a defendant who doesn't take the stand has a very, very, very slim chance of getting acquitted. And all these other exceptions come in. So we've totally eviscerated the importance of Miranda, which is to advise people of their rights, have law enforcement respect those rights. The FBI has been giving Miranda warnings for over 100 years. The British have been giving them. Dickens even talks about Miranda warnings. So, but, I mean, I think it's just a sad commentary on our system. The military gives Miranda warnings. Do you know that? Do you know that? I'll take your word for that, Your Honor. Well, you research it. And the military takes them very seriously, very seriously. You don't see a lot of, sometimes the military courts have greater respect for the constitutional guarantees than civilian courts do. And I don't know why there's such an objection to being tribe military courts, but there apparently is. So, anyway, go talk to Jerry Brown and see what he thinks about this. I'm sure he's going to stop by your office later this afternoon to ask how it went. I'll call him. So, Jerry. It's possible. Get over there. Yeah. He's a young guy. In this case, the full Miranda warnings were given to Ms. Scott. And the detectives here told her it was her decision whether or not she wanted to talk to an attorney. She never said, I want to talk to the attorney. Please stop the interview. I think I want a lawyer before I say anything else. But they clearly told her, if that's your decision, if that's what you decide, we have to stop the interview. They told her you can't see a lawyer until Monday. When do I get a lawyer? Monday. Well, this was at 1130 at night. The public defender's office is open 24 hours. Well, I think this fully complies with Davis and with Noddy and Prysock. It probably does. I'm just talking to you, that's all. I don't get too many captive audiences on this subject. Anyway. How about the second issue? Well, the second issue I think I'd like to point out that I don't think this case is even governed by Mathis. Mathis is a short case. It's a three-page case. It only deals with IRS agents. It says a person's in custody, an IRS agent interviews them, they've got to get their Miranda warnings, because the IRS agent is a law enforcement officer doing a law enforcement investigation. The social worker here, Miss Boyd, was not doing a law enforcement investigation. She wasn't an agent of law enforcement. In fact, the detectives didn't really encourage her to go there. They didn't provide her any help. They didn't tell her anything about the case. In the early morning hours, apparently she was running around trying to figure out what was going on. She even went to the defendant's home to try to find the defendant, didn't know at first that she was even in custody. There were two kids. There was, yeah, there was the child who was murdered and there was an infant child, I guess, who was about seven months old at the time, and the social worker was trying to figure out what to do as far as placing that child. Well, wasn't the social worker concerned with finding out what kind of a mother Scott was for purposes of removing custody of the other child from Scott? Well, I think... Was that an investigative purpose? It's not a law enforcement purpose. She wasn't there on behalf of law enforcement. She wasn't... She had no penal involvement, but certainly she was representing the government. Well, she actually objected to be testifying in this case and her department did not want her testifying in this case. They wanted that kind of conversation to be kept confidential and not to be used in this kind of investigation. So Matt... In a sense, defeats the effectiveness or cuts back on the effectiveness of her job. You see, here's a lot of stuff from people that she's trying to help. Well, it would have been more effective for her if the detectives had sat down and told her what was going on in the case and that the defendant was actually being accused of murdering one of the children. But apparently... How did she get into the walk-up to talk to this lady? According to her testimony, she eventually talked to the watch commander and found out where she was being held in custody and then sat down and interviewed with him. And the watch commander let her go in? Excuse me? And the watch commander took her in? Yes, apparently that's what happened, yes. What about the third issue? Well, I think the third issue is resolved by Paragraph 4 of the Destruction Calendar 3.02, which requires the crime of murder as charged in Count 1 to be a natural and probable consequence of the commission of the felony of child endangerment. So in order to find Paragraph 4 for the natural and probable consequence theory, you have to find that a murder was committed. And in this case, the evidence would only have shown that the murder was committed by Foster or Scott, or them together. What in Paragraph 4 requires a finding that murder was committed? Well, the instruction says in order to find the defendant guilty of murder as charged, Paragraph 4, the crime of murder, you must be satisfied beyond a reasonable doubt that the crime of murder is charged. They would have to find a murder existed in order to even get through that Paragraph 4 instruction. See, it doesn't say that the crime of murder was committed. It says the crime of murder was a natural and probable consequence of the commission of the crime of felony child endangerment. You're obviously listening to the exchange you went before. It's the position of petitioner that there's a piece that remains missing. Unless you read that to say you have to find that there was murder, just finding that there was felony child endangerment and finding that the murder was a natural and probable consequence does not include the element of the conscious disregard of the risk of death. Is there anything in these instructions that require the jury to have found that Foster, is that the other guy's name, Foster, had a conscious disregard of the risk of death? Well, 3.02, the natural and probable consequences instruction, doesn't contain all the instructions of the target crime, of the actual murder crime. It never would. What it does is it refers you to the crime of murder as charged from count one, and that contains those elements, including the conscious disregard. Also, there are other theories. I want to be able to parse that because I fell off on the curve someplace. What is it, where can we be confident that the jury found conscious disregard of risk by Foster? The jury, in order to find paragraph four, has to find that somebody committed a murder. See, that's where I pause. Okay, if I accept that, fine, you win, not a problem. But if I look at paragraph four and I don't see in there a requirement that they find murder, are we missing an element? I mean, the answer to that may be a simple yes, and so the question becomes, does paragraph four require the jury to find that somebody committed the crime of murder? Well, I don't think you can find murder being a natural and probable consequence without finding that somebody had committed the murder. Oh, sure you can. I mean, there are lots of cases where murder may be a natural and probable consequence, but it didn't happen. Suppose the person didn't die. You wouldn't have had a crime of murder as a natural and probable consequence. Sure, but that's not this case, obviously. Somebody did die, and that's why we are here. Well, counsel, didn't they, I'm reading this, in order to find the defendant guilty of the crime of murder as charged in count one, were other instructions given as to what necessary elements were of murder as charged in count one? Yes, but they weren't given as part of CALJIC 3.02. They were given as part of the murder instruction. Right, but they were given to the same jury at the same time, right? Yes. I'd also like to point out on that, in that in argument, neither side, the defense or the prosecution, talked about the natural and probable consequence theory. Instead, the concentration of both sides was on the implied malice theory. In fact, we have a question from the jury, which indicates they were trying to decide as to defendant Scott, whether it was involuntary manslaughter or second-degree murder, which would indicate that they were looking at this as implied malice murder, not necessarily as a natural and probable consequence murder. But he wasn't convicted of murder. There were two separate juries in this case that decided the evidence separately, and it's almost as if there were two separate trials in that way, and it's hard to use one trial to determine, you can't use the verdict as to him to determine what happened as far as the jury with her, because they're separate juries. There may have been other things that came into play. Do you know what portions of the evidence, I don't know if the record would reflect it, so you should feel free to answer no if you don't. Can we tell from the record in this case what evidence the jury for Foster heard and did not hear? For example, is it safe to assume that Scott's statements were not presented to Foster's jury, or did they come in somehow as co-conspirators or some other way? Foster's jury did not hear Scott's statements.  Including some of the statements that he had made to his father. So you did have a little bit of separation of the evidence. Both juries heard the coroner's evidence, and they investigate the detective's evidence as to what they found in the trunk of the car, with the baby being in the box and wrapped up and the limbs cut off and all that. But the statements, each jury heard separately with the statements as to each defendant. The court will please indulge me for two minutes. The last point first. Jurors are presumed to follow their instructions. Richardson against Marsh. They were given a constitutionally defective instruction. There is a presumption that they followed it. That may well have been the basis on which they convicted Scott of murder. Turning to the first issue, the statements she made to the police. This case does not comply with Davis. Davis holds two things. One, the invocation of counsel must be unambiguous. Two, the word maybe before I should talk to an attorney makes the invocation ambiguous. That's all Davis says. Davis does not say that the words I should talk to an attorney are ambiguous. And this court has held in Smith against Endo, which relies on clearly established Supreme Court law in Oregon against Bradshaw, that the words, are you looking at me as a suspect? If you are, I should talk to a lawyer, is unambiguous. We discussed that at page 21 and 22 of our opening brief. Secondly, and finally, with regard to the Mathis issue, the ratio de sedendi of Mathis is not that the questioner was an IRS agent. It had nothing to do with the fact specifically that he was an IRS agent. It's that he was a government agent questioning a person in prison under circumstances which may have led the prisoner to make self-incriminating statements that would yield a criminal prosecution, as indeed it did. And as it did in this case, too, when the social worker, a government agent, questioned Scott, a prisoner, under circumstances which could lead her to incriminate herself and result in her criminal prosecution. Finally, the detectives told Scott that the child had been murdered. Not that the child was dead, but that she had been murdered. And they told Scott that the parents of that dead child were in custody in the jail at that time. And indeed, Julian Boyd, the social worker, waited until Scott was booked before she went to question her. So Julian Boyd knew all about this before she questioned Scott in relation to the dependency hearing that was pending. Thank you very much. Thank you. Did you get a name that stuck in that last sentence? I hope not. Yeah. You meant not the detective told Scott. The detective told Boyd. Yeah, Boyd. I'm so sorry. They said Scott. My mistake. I apologize. But we understood. Thank you. Yeah. All right. We have figures.
judges: Pregerson, Clifton, Bea